Good morning, Russell Marlin for the appellate Clayton Stewart. We have essentially four issues. One is probable cause, whether the use of force was deadly force, the failure to recognize a medical need, and then the unconstitutional policy as written by the department. Starting with probable cause, we have to look at what Officer Garcia knew in the moment that he pulled the trigger on his Taser. And what he knew is that he was sent to the 900 block of Melrose in Jonesboro, and when he got to the 300 or 400 block, about five or six blocks away, he sees two guys running around a car, chasing each other. And so he stops his car, one runs, and he chases him. That's all he knew. He had no idea whether he was seeing the person he was sent to arrest, or in fact, what he was told is that there was a domestic disturbance inside of an apartment where a man had hit his girlfriend. Well, didn't he see more of a physical altercation you're describing? Didn't he describe that he saw people struggling, fighting, or wrestling? He did not use the word fighting. Okay, he was struggling or wrestling. He initially used the word chasing, and honestly, in his deposition, it appeared to realize that that wasn't enough, and added struggling and wrestling. Yeah, he said, I'm not going to say they were throwing punches, but they were like chasing each other, and at one point, they were kind of like struggling. I don't know how you'd describe it, but wrestling, right? Yeah, that's what he said. And so he stops his car, gets out, and one of them runs, and he chases him. Now, at that point, in his mind, he's five or six blocks away from where he's supposed to be. He has no idea. Didn't the person who didn't run say something to him? Didn't he say there's some variation? Well, Garcia himself testifies differently about that. In his deposition, he says, yes, the guy that didn't run said, that's him, or something like that, I think is what Garcia added the phrase, or something like that. So he's not sure what the guy said. And when he's telling this story to Internal Affairs, he never mentions that the guy said anything at all. So that's the fact that's most favorable to the non-moving party. He literally gets out of his car and chases somebody who runs. Now, that in itself maybe is okay, but you can't layer on top of that any of the domestic disturbance or anything else that may have happened, because Garcia didn't know that that was related. He had no idea. In fact, when the other officers show up on the scene, that's the first thing he says, I didn't know what was going on. So if that's probable cause, it is very, very weak. The next is whether or not the use of his taser was deadly force. Deadly force doesn't necessarily have to be a gun. It doesn't have to be a weapon that is innately deadly. How you use the object can become deadly force, and it's well-known in the police circles that you just don't tase somebody in an elevated position. If you do, there's a risk of harm. That's why you don't do it. Jonesboro itself has a policy saying don't do this. He did it anyway. Let me ask you, though. Is there a case that makes this clearly established? There is a Pennsylvania case, Martin v. City of Reading in Pennsylvania, the Eastern District Pennsylvania case, that says it's well-known in police circles that you don't tase someone in an elevated position because of the risk of harm to the suspect. Well, I think that aren't there cases from the Third, Sixth, and Eleventh Circuits that say that tasing someone in an elevated height poses a substantial risk of substantial injury or serious bodily harm or death that they should be mindful of, and that's Bradley and Perroza-Benitez v. Smith in Baker v. Union Township. But the problem you're going to run into is that we do have an Eighth Circuit case involving Barnes where a person was tased and fell through a window, right? Or I guess it's McKinney. McKinney, yeah. The McKinney case is, the use of the taser in that case was they're using the taser to try to stop him from jumping out the window. If they don't stop him, he's still jumping out of a second-story window. So the question there becomes, and that case bothered me, honestly, is a factual question is how much did the use of the taser elevate the risk of harm, or did it elevate it at all? If you're going to jump out of a second-story window, there's already a risk of harm, and the taser may not change things much. And that's a very nice and neat argument, but the question is as we start talking about what's clearly established and what's not clearly established, we're going to have to look at McKinney and say that somehow it's given sufficient notice about tasing at an elevation or something. Because ordinarily we look at Supreme Court cases, we don't really look at other circuit cases, and we don't have any district court cases. Sometimes you have 14 district court cases within our circuit, and you can say, yeah, these officers should have been aware of it.  We're talking about tasing people at an elevation. And I think the difference is purely factual, is that McKinney is about using a taser on someone who is not in an elevated position. At the moment they've deployed the taser, he's not in an elevated position. It becomes elevated when he jumps out the window. And what do we have here? The district court acknowledged it, said it's unclear exactly how high off the ground Stuart was when the officer tased him, but then just said that's a judgment call. So what do we do with that? We don't even really have facts that the district court found viewing in the light most favorable to your client how high. So, you know, unfortunately we just don't have. I think we do have facts. Because Garcia's testimony was that when he deployed his taser, they deployed him to stop him from going over the fence. Maybe that's okay, maybe not. But when he deployed his taser, he couldn't tell whether or not the taser engaged because Stuart disappeared over the fence. So we know that the moment he gets tased, he's high enough that he could disappear over the fence. What kind of time frame? As I understood the testimony, he sees his head above the fence, which I think is measured a six-foot fence, and Mr. Stuart is six foot. So at least his head is above, so the feet are off the ground. You're assuming. Do we have anything after? Sorry to interrupt, but do we have a time frame of when I see the head, when I tase, and when I see him no longer? Well, yes, because what Garcia says is, first of all, just because his head's above the fence doesn't mean the rest of his body is vertical. In fact, it probably means it's not. In order to climb, it'd have to not be. Two, that once the taser engages and you pull the trigger and the taser engages and he disappears before he can tell whether or not he gets that neuromuscular lock, that tells you where he is. But if it didn't lock, because there was some question about that, and I'm not sure there was an answer necessarily by the expert, but if it didn't engage, he could still keep climbing. Is that one possibility on this record? It is possible. It's possible. But the key on that is when he actually falls and the video, that finally turns his video on, and he removes two prongs from his skin, one from his back and one from his left body. As a matter of looking at this record, does that tell us that it worked? How about this? Is there any scientific evidence from the expert that says, yes, the likelihood that this engaged because I'm looking at this. I see this one engaged here, this one didn't there. The likelihood of it actually having incapacitated him within seconds is this. Do we have that? What the expert says is that even if the two prongs there, first of all, the only way we could have known that is if they kept the cartridge, which they have a policy of not doing. So we can't even analyze that. So that evidence was destroyed. But what the expert says, even if you have a partial contact with the skin, it's still enough to cause some reaction. Do we have percentages of likelihood beyond just some incapacitation? No. Are we supposed to be drawing any conclusions based on spoliation of the evidence? I think it's – In a civil case, we do that. We'd sit there and say there's been spoliation because somebody's – I didn't get to that point procedurally. We followed some of the judgment and then waited almost a year for a decision. But we didn't get – So as I'm looking at this thing, and we've got six feet up on one side, eight feet down on the other, right? Yes. And as he's going up on the six-foot side of the fence, he's shot with a taser at some point, something happens. Now, you could draw a reasonable inference that because of where his center of gravity is, when he's tased and he flexes, he's just going over the fence. But you also could draw the conclusion is that he just went over the fence the wrong way, hit the ground eight feet down, and then when – even if the taser goes off, that his spine may already have been broken and the damage already done, and it may have just been just bad luck on his part as to how he fell over the fence. And I think those two reasonable inferences are called jury questions. I should have gone to the jury. Now I can reserve the rest of my time. Very well. Thank you. Good morning again, Your Honors. My name is Keith Wren. I'm here on behalf of Officer Victor Garcia of the Jonesboro, Arkansas, Police Department. Here with me this morning is Gabrielle Gibson, my co-counsel. She is here on behalf of the city of Jonesboro, Arkansas, and also Chief Rick Elliott in his individual capacity. Your Honors, this particular case – I know that recently there has been a lot of criticism of the doctrine of qualified immunity. But this is the quintessential case where qualified immunity really is appropriate. Certainly we can all think of a Hope versus Pelzer type fact scenario where we would say clearly qualified immunity would not be appropriate where a man was standing on the precipice of a bridge and an officer tasers him that would most assuredly cause him death or serious physical injury. We don't have that here at all. What we have with the plaintiff's case is the fundamental problem with their case is their argument is that they're conflating the use of a taser with the use of deadly force, and that's simply not the facts of this case. Why don't you start maybe where Mr. Marlin started, the probable cause for going after him in the first place. Certainly, Your Honor. The dispatch that Officer Garcia heard, as I recall it, was that he was called to a domestic violence situation in which a man had hit and choked his girlfriend. And the call went out to the 900 block of Melrose Street in Jonesboro, Arkansas. Melrose Street actually only goes to the 700 block. The officer, as he was driving to this area where the incident occurred, he sees two men engaged in some sort of tumultuous behavior. It has been generally described as either fighting or struggling or wrestling. But in any event, they were not being peaceful. They were out in the street engaged in some sort of tumultuous behavior. Officer Garcia stopped, at which point both men ran. However, a gentleman named John Bedford Russell stopped and pointed to the plaintiff and said, that's him. Officer Garcia at that point continued to, after the plaintiff, shouting commands for him to stop. Let me ask a factual question. When he was relayed the information from the domestic disturbance call, was there any notice of another? I know there was an assault on the girlfriend. Was there any notice of another man being involved? I don't recall that being part of the dispatch call. Right. So aren't we sitting here now, what you've got is a fleeing misdemeanor at most, right? You've got some kind of disorderly conduct or some kind of low-level brawl that's going on, right? Certainly that's a possibility, but police officers, as we know, are often given incomplete information in situations where they're expected to react quickly. And that's the situation that we have here. I'm having a hard time. How remote are we from the place where the officer was really dispatched to go to? If you say that there is no 900 block, and I assume that he's going to drive to the end of the road, what's the street numbers at the end of that road? Are they 700 block? It ends in the 700 block. The actual incident occurred in the 500 block. So it's a couple blocks away. It's in the vicinity. And so that's in the general vicinity. And you see people chasing, maybe wrestling and, you know. Correct. And, you know, there is no evidence to say that at that particular moment that he sees two gentlemen in the street wrestling that he knows that these are the ones involved, but he knows he's been dispatched to the area and he sees this tumultuous behavior. Are the following two blocks similar to this 500 block? In other words, apartment complexes that might be consistent with the dispatch that he received? The photographs that are contained in the record are consistent with all of the housing in that area. So, in other words, there could be similar housing in the 700 block than there was at the 500. So it would have been consistent with the dispatch call? All of this is in the vicinity of the Arkansas State University in Jonesboro, and I think all of these housing at some point was probably student housing, and it's all very similar little quadplexes. But in any event, Officer Garcia continued to shout commands to stop, which were not obeyed. Certainly, just simply at that point, he has probable cause by what he viewed to arrest probably both, but certainly the plaintiff for disorderly conduct. Is there anything in the record beyond that's him or it's him? In other words, is there anything in the record that links what the second man wrestles, who that was, what he says to the officer that would link up the dispatch call and what he's viewing? Well, I mean, in the eyes of the officer, I think that he would be correct in considering not only the information he got from dispatch and the information from Mr. Russell, but also the headlong flight of the plaintiff, and that he disobeyed the commands to stop, and then subsequently the warnings that if you don't stop, you'll be tased. You know, there are a couple of things that were not really analyzed much by the district court, that as I looked at the record, there's the Jonesboro Police Department policy that talks that basically that you should never use a degree of force other than that which is lawful, reasonable, and necessary for the specific situation. So that policy's out there. And you also have the evidence that was acquired during the internal investigation and the findings afterwards where they said that Officer Garcia had been trained not to deploy his taser on any subject who was on an elevated surface. And I found it a little unusual that the district court never at least analyzed those things, and does that matter in the analysis or not? I would say that the analysis of that, and I'm not exactly sure where you're going with that, Judge, but if I'm wrong, let me know. But I think that really the district court's opinion was very succinct on this, in that, for example, he said that it was unclear how high the plaintiff was on the fence and that this ultimately resulted in a judgment call. And I think that that, although it was succinct, was probably enough, because really that is at its core why we have qualified immunity. But if it's unclear how elevated he was at the time the taser was deployed, it may not matter if it's six inches versus four inches, but if there's enough in the record to make the inference that he was actually at the top of a fence, which is six foot, isn't that more than a judgment call versus the six inches off the ground? I'd like to answer that in two ways. One, factually, in the record, the plaintiff himself says he doesn't remember any of this. So we have no competing set of facts here. We have what Officer Garcia said. Officer Garcia, essentially, in the record, we have three different statements from him. We have one of him on a video where he's explaining, I think, to a supervisor who pulled up in a very summary fashion of what occurred. We have his internal affairs interview that was audiotaped, and then we have his deposition testimony. And in all of those three statements, not surprisingly, he does not use exactly the same words. He describes the incident in three slightly different ways. But what is consistent is this. At no point did he ever indicate that he thought that the plaintiff was in some dangerous elevated position at the time that he pulled the trigger on that taser. All of his testimony is that he was trying to stop him from going over the fence. Is it right that he did say that his head was above the six-foot fence? Is that accurate? I think that the testimony was, as they were running towards the fence, this is, of course, at night in a dark area, he is running towards what appears to both plaintiff and Officer Garcia to be a normal, standard six-foot privacy fence from their viewpoint. And he said that Mr. Stewart, who we know to be right at about six feet tall, he said he could just see the top of his head above the privacy fence when he pulled the trigger on the taser. Would there be a reasonable inference from that fact, understanding we have a limited number of facts, but an inference that in order for his head to be that high, he's already in the process of climbing and some other part of his body is up toward the top of the fence as well? Well, Your Honor, I mean, I can only say what those facts say, but Officer Garcia, and I think that's the important part, was that at no time in any of Officer Garcia's statements did he say that I saw anything other than his head. And I understand that. So that's all we've got. Is it a reasonable inference, in your view, or why is it not a reasonable inference that for his head to be that high above, a six-foot man's head to be that high above, he's also got part of his body up ready to go over as well? Well, I think that you could think of a lot of factual situations where simply someone's head, who is about the same height, might be above an object. Maybe when they're running, they're bounding as they run, or maybe when he first gets there, he grabs and pulls, but that doesn't mean that his body has gone up and over. If I could maybe phrase it a little different. Is it unreasonable? Is that just an implausible inference? Is that what you're saying? Or is it within the realm of, you know, you've offered up some possibilities. Is this one of those possibilities? Well, the problem I have with that is, and I may not be answering your question, but we don't have those facts in the record. If it were the fact that this officer says, I saw his leg going over the top of that fence, we might be having a different conversation. And, of course, the argument is, what's the reasonable inference that can and should be drawn in a light most favorably to the plaintiff? Because, as I was told, that's a jury question, right? Right. And the question is, is that if in fact, you know, there's a number of things you can presume, you know, or you can infer. You can draw an inference that, well, he goes over the top of the fence if he's been tased and he's convulsing, which, you know, you watch somebody get tased. It's pretty clear what they do. And he just went over the fence. Well, then his center of gravity was already at an elevated place. That's one possibility. The other possibility is that he was already going over the fence and just went over it and may have been tased in midair. And that may have done something to him that resulted in his injuries. Or the third thing is he could have just gone over the fence, landed on his back, and was already injured, and the taser either deployed or did not deploy. And if it deployed, it may have been at some point where it didn't really matter. Yes, and I think that your question answers the question. Because could all these have happened? Perhaps. But based on this record, it would require speculation and conjecture to say that the tasering caused it to happen. And in this particular case, we have no evidence of that whatsoever other than pure speculation that the man went over the fence and was injured and a taser was deployed. We don't even know if the taser connected. When he testified that he saw the head over the fence, from what perspective? Was he behind? Yes, and I think you can look at the photographs in the record. It's a quadplex building with a deck on the back, and then it's like three-fourths enclosed with, well, two-thirds enclosed, one by the building itself and then two-thirds by a privacy fence. So you're running down a narrow alley, basically, right towards where Mr. Stewart apparently attempted or did go over the fence. And, of course, on the other side, it's a greater drop because the ground is actually at a slope, but the deck is built flat. But it's Garcia behind Stewart, then the fence. That's correct. So he's watching him. They're running towards the fence. But he noticed that his head was above the fence. He saw at some point that his head was the... Above the fence line, so to speak. Right, and then specifically how much is not clear from the record. And, again, getting back to this, this is the case where you have an officer who is chasing someone who is... The report was some type of a crime of violence, who's not obeying commands, who's not obeying the warnings that if you don't stop, you will be tased. And it is certainly a reasonable belief of that officer that this gentleman could pose a risk of danger to the public and needed to be stopped. And it would be incorrect to not give him qualified immunity in this situation. I think we've read the cases that talk about, you know, in the hazy border areas, that's where qualified immunity is appropriate. And in this particular case, I would say that the facts don't even get you to the hazy border area but, as Judge Marshall noted, where he was on the fence was unclear but there is no evidence to support that the officer knew that he was in some dangerous position. What about the deliberate indifference claim that after he's already been injured and he's laying there and the officers kind of ignore him because they believe that he's just trying not to go to jail and they start dragging him and then have him in a sitting position up against a car and they eventually, you know, I don't know what goes on with EMTs in Arkansas but it struck me as somewhat strange that he doesn't get on a backboard and get on the ambulance but instead they toss him into the back of a patrol car. His feet don't actually get in there very well so they start shoving on him. You know, it strikes me as a little bit beyond the pale and Judge Marshall described it as gruesome and I assume that you think that's kind of a red herring and I shouldn't be looking at it. Well, those facts, as the judge noted, are very difficult to watch and I can't deny that but again, the objective evidence was the officer immediately asked him numerous times do you want medical assistance, which he denied. I think that they did pick him up and drag him after the point he denied medical assistance. It is certainly a reasonable thought to think that had he said I need medical assistance now... Well, he kept saying I can't feel my legs or move my legs. I mean, it does not seem to be really a very prudent thing at that point just to start dragging folks around. Well, and he also asked the EMTs if he could just make the officers go away. They also were pretty clear, this guy's drunk, this guy's drunk, I can smell it. So on the one hand they're saying this guy's inebriated, he's not making sense but they're taking at face value some of what he said. So kind of judgment calls, perhaps, but... But the medical personnel were called within seconds after his first complaints of injury and then ultimately the officer relied upon their... We can say all day that they were inept or negligent but it would not be deliberate indifference. Thank you, Your Honor. Thank you. Thank you, Mr. Redd. Mr. Marlin, rebuttal. He keeps talking about how what Garcia... At no point did Garcia think he was in a dangerous position. That's not the standard. The standard is what would an objectively reasonable officer think in that position. And you see someone high enough that you can't tell whether the taser locked because he disappears over the fence, that's high. That's what objectively reasonable would dictate. And we have a problem with their policy to begin with is that while they have a definition of objectively reasonable in their policy, they don't actually apply it. What they apply both to the use of deadly force and to the use of less than deadly force is what the officer thinks in that situation. That's not the standard. The standard should read what an objectively reasonable officer would think in that situation. And they're just never told that. So the policy itself is a problem. And about the EMTs, and the video is clear. Stewart complained of pain like 28 times, begged for help throughout the video. And when the EMTs actually show up, Garcia steps away from Stewart and intercepts them before they can get to the patient and starts putting in their head that he's faking. They never told him that he complained of pain, never told him that he had never voluntarily moved his legs or his feet, never told him how many times he'd asked for help. And so where you, the officer, intercept and don't give complete information to the EMTs, you cannot rely on what they say. And there's the, I think it's the McNeese or the Reese case, I believe is what says that. And so we have a policy, the department's policy on its face does not tell officers, at no point does it tell officers that they should consider what an objectively reasonable officer would do in that circumstance. So they don't apply it. And that's... When you say he asked for help, there's no doubt he was complaining about pain. But he was asked multiple times whether he needed medical help and he kept saying no. Yeah, and there's a lot of who knows. I mean, he doesn't remember those, thank God, he doesn't remember those moments. But there's a lot of reasons people don't want an ambulance, they're expensive. And the EMT, if I recall right, even though he may have been given bad information, he went over and I think he did a little pinch test on his feet. And Mr. Stewart reacted to that. Well, I think that's a question. Did he? When you watch the video, it's hard to tell. You don't really see much movement. You do hear groaning, but you hear groaning all the time, so I get that. But, you know, the EMT makes a reasonable conclusion that the groaning is related to the movement of the foot and the pinching of the foot, maybe. Maybe. And if it was, if the conclusion was that he had feeling in his foot at that moment, then Garcia caused his paralysis by putting a shovel into the car. That's the only inference, the only possible inference. So they either ignored it or they caused it. Either way, the case should go to the jury. Absent. Anything else, that's all I have. Hearing none. Thank you. It's an unfortunate situation and we'll do our best to figure it out. We appreciate counsel's appearance and we'll issue an opinion in due course.